# EXHIBIT 1

Filing # 36353422 E-Filed 01/08/2016 04:55:13 PM

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2016 – 000559 – CA - 01

MULTIMODAL DEVELOPMENT GROUP, LLC,
a Florida limited liability company,

       Plaintiff,

vs.

CHEMONICS   INTERNATIONAL,   INC.,   a
Delaware corporation,

       Defendant.

_____/

## COMPLAINT

Plaintiff sues Defendant and alleges:

### PARTIES, JURISDICTION AND VENUE

1.     This is an action for damages in excess of $15,000.00, and is within the jurisdiction of this Court.

2.     Plaintiff, MULTIMODAL DEVELOPMENT GROUP, LLC ("Plaintiff"), is a Florida limited liability company transacting business in Miami-Dade County, Florida.

3.     Defendant, CHEMONICS INTERNATIONAL, INC. ("Defendant") is a Delaware corporation.

4.     This Court has jurisdiction over the Defendant because it (a) breached a contract in the State of Florida by failing to perform acts required by the contract to be performed in the State of Florida, and (b) engaged in substantial and not isolated activity within the State of Florida.

CASE NO.:

5.      Venue is proper in Miami-Dade County, Florida because the causes of action accrued in Miami-Dade County, Florida.

**GENERAL ALLEGATIONS**

6.      On January 12, 2010 a massive earthquake caused catastrophic damages in Haiti. The United States of America, through USAID, decided to help. Part of this help involved the award of a grant to the Haitian Government, under USAID Contract No. DOT-I-00-08-00033-00, Task Order 3, for the construction of temporary assembly and administrative facilities for the use by the Haitian Parliament in Port au Prince ("Project").

7.      Defendant was the prime contractor on the Project. Defendant solicited proposals under REP-HRI-009, for the design, construction and furnishing of the Project's facilities.

8.      Plaintiff submitted a proposal pursuant to the solicitation.  Defendant accepted the Plaintiff's proposal and pursuant thereto, prepared a written contract to reflect the parties agreement.

9.      On or about January 10, 2011, Fixed Price Subcontract No. CHE145-TEMPO Construction-01 ("Subcontract 1"") was signed by Defendant and "Tempo Construction." A true and correct copy of Subcontract 1 is attached hereto as **Exhibit "A."**

10.     In fact, at all times material hereto, "Tempo Construction" was not a valid legal entity nor was it a legal trade name of a valid legal entity.

11.     "Tempo Construction" was a joint venture between Plaintiff and Jeanty & Co (Tempo). At all times material hereto, Plaintiff is and was the designated representative and

2

CASE NO.:

agent for the joint venture. Plaintiff brings this action in its own right and as the authorized

joint venture partner, representative and agent of "Tempo Construction."

12.     On April 29, 2011 Plaintiff informed Defendant about a soil study which reflected

differing site conditions resulting in the need for extra work with higher expenses.  As a result,

Plaintiff asked for a price adjustment.

13.     Defendant advised Plaintiff that it could not currently make a price adjustment

due to problems unrelated with the contract and intended to compensate Plaintiff for the extra

costs.

14.     Defendant informed Plaintiff that payment could not be made unless and until

Subcontract 1 was modified.

15.     On or about August 5, 2011, the Defendant prepared Modification No. 1 to

Subcontract 1 with "Tempo Construction" named as a party thereto. Modification 1 did not

include the extra work and expenses associated with the differing site conditions that

Defendant agreed to pay to the Plaintiff.

16.     Defendant explained to Plaintiff that the costs for the agreed upon change

orders had been left out of Modification 1 due to an error, but they would be included in a

second subcontract. Based on these representations, Modification 1 was purportedly signed on

behalf of "Tempo Construction" on or about August 8, 2011.

17.     Around that same time, unbeknownst to Plaintiff, Defendant had prepared

Subcontract No. PAP006 ("Subcontract 2"). "Tempo Construction" was a party to Subcontract 2.

18.     Subcontract 2 was never provided to the Plaintiff. Instead, the Defendant

provided Subcontract 2 to Mr. Jean Gerard Jeanty for review and signature.

3

CASE NO.:

19.    In fact, Mr. Jean Gerard Jeanty was not an authorized representative of the Plaintiff and did not have the authority to accept or sign Subcontract 2.

20.    On or about August 1, 2011, unbeknownst to the Plaintiff, Mr. Jean Gerard Jeanty signed Subcontract 2. Subcontract 2 did not include the extra work and expenses associated with the differing site conditions that Defendant agreed to pay to the Plaintiff.

21.    So, at the time Defendant made promises to the Plaintiff that the second subcontract would include the extra work, Subcontract 2 had already been signed.

22.    Defendant's unwillingness to pay generated delays in works, halt of works and caused violent situation at the worksite due to lack of cash flow.

23.    Not only was the Project delayed and stopped due to Defendant's refusal to comply with payment, but also Plaintiff's employees were faced with an angry mob of workers demanding their salaries. These laborers threatened Plaintiff's employees, resulting in certain employees having to bear firearms for fear of great bodily harm or death.

24.    Defendant underpaid most of Plaintiff's invoices, but also has outstanding invoices that have not been paid at all.

25.    All of the work on the Project was performed by the Plaintiff.

26.    All payments made by the Defendant with regard to the Project were made to the Plaintiff. These payments were made to the Plaintiff in Florida.

27.    All conditions precedent to the filing of this action have been performed, have occurred, or have been waived.

28.    Plaintiff has retained the undersigned law firm to represent it in this action and is obligated to pay said firm a fee for its services.

CASE NO.:

## COUNT I
## BREACH OF CONTRACT

29.     Plaintiff realleges and reavers the allegations contained in paragraphs 1 through 28 as if fully set forth herein.

30.     "Tempo Construction" and Defendant entered into a contract. See Exhibit "A."

31.     Defendant breached the contract by failing to pay "Tempo Construction" for work performed, services rendered, and costs expended.

32.     As a direct and proximate result of the aforesaid breaches, Plaintiff has sustained damages, including, but not limited to, work performed, services rendered, costs, overhead and profit and interest expense.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory damages, plus interest thereon, costs and such other and further relief as this Court deems just and proper.

## COUNT II
## UNJUST ENRICHMENT

33.     Plaintiff realleges and reavers the allegations contained in paragraphs 1 through 28 as if fully set forth herein.

34.     Plaintiff conferred benefits upon Defendant by providing valuable construction related services on the Defendant's behalf and at the Defendant's request.

35.     Defendant was aware of the benefits that Plaintiff conferred upon it.

36.     Defendant accepted the benefits that Plaintiff conferred upon it.

37.     Defendant has not compensated Plaintiff in full for its services.

CASE NO.:

38.   Under the circumstances, it would be inequitable for Defendant not to compensate Plaintiff for its services, including, but not limited to, costs, overhead and profit and interest expense.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory damages, plus interest thereon, costs and such other and further relief as this Court deems just and proper.

## COUNT III
## QUANTUM MERUIT

39.   Plaintiff realleges and reavers the allegations contained in Paragraphs 1 through 28 as if fully set forth herein.

40.   Defendant acquiesced to the services performed by Plaintiff regarding the construction of the Haitian Parliament building.

41.   Defendant was aware that Plaintiff expected to be compensated for the services performed by it.

42.   Defendant did not compensate Plaintiff in full for those services.

43.   Accordingly, Defendant was unjustly enriched at the expense of Plaintiff.

44.   As a result, Plaintiff has sustained damages, including, but not limited to, work performed, services rendered, costs, overhead and profit and interest expense.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory damages, plus interest thereon, costs and such other and further relief as this Court deems just and proper.

CASE NO.:

## COUNT IV
### SERVICES RENDERED

45.     Plaintiff realleges and reavers the allegations contained in paragraphs 1 through 28 as if fully set forth herein.

46.     Plaintiff performed valuable construction services on behalf of and at the request of the Defendant.

47.     Defendant owes Plaintiff the total amount of $2,654,562.65, that is due with pre-judgment interest, for those services.

**WHEREFORE**, Plaintiff demands judgment against Defendant for compensatory damages, plus interest thereon, costs and such other and further relief as this Court deems just and proper.

## COUNT V
### DECLARATORY RELIEF

48.     Plaintiff realleges and reavers the allegations contained in paragraphs 1 through 28 as if fully set forth herein.

49.     This is an action for Declaratory Relief, under sections §§86.011 et seq., Florida Statutes to determine a question in actual controversy between Plaintiff and Defendant.

50.     There is a bona fide present need for a declaration by this Court, as to the validity and enforceability of Subcontract 1, Subcontract 2 and any modifications thereto.

51.     Plaintiff has a justiciable question as to whether Subcontract 1, Subcontract 2 and any modifications thereto are void or voidable and a bona fide actual and present need for declaratory relief.

CASE NO.:

WHEREFORE, Plaintiff demands judgment determining whether Subcontract 1, Subcontract 2 and any modifications thereto are void and unenforceable, an award of costs, and for such other and further relief as this Court deems just and proper.

## COUNT VI
## DECLARATORY RELIEF

52.    Plaintiff realleges and reavers the allegations contained in paragraphs 1 through 28 as if fully set forth herein.

53.    This is an action for Declaratory Relief, under sections §§86.011 et seq., Florida Statutes to determine a question in actual controversy between Plaintiff and Defendant.

54.    There is a bona fide present need for a declaration by this Court, as to whether the claims asserted herein are subject to the arbitration clause contained in Subcontract 1.

55.    Plaintiff has a justiciable question as to whether the claims raised herein are subject to arbitration and a bona fide actual and present need for declaratory relief.

WHEREFORE, Plaintiff demands judgment against Defendant declaring that the claims raised in this lawsuit are not subject to arbitration, an award of costs, and for such other and further relief as this Court deems just and proper.

**KOSS LAW FIRM, P.A.**
201 Alhambra Circle
Suite 1200
Coral Gables, Florida 33134
Telephone:    (786) 787-2849
Facsimile:    (305) 448-7085
Primary email: service@piedralaw.com
Secondary email: jeremyakoss@aol.com


BY: _____
       JEREMY A. KOSS, ESQUIRE
       Florida Bar No. 612900

8

**FIXED PRICE SUBCONTRACT No. CHE145-TEMPO Construction-01**

Between

**CHEMONICS INTERNATIONAL INC.**
**1717 H Street NW, Washington, DC  20006**
**Hereinafter referred to as "Chemonics"**

And

**TEMPO CONSTRUCTION**
**3 Rue Stephen Archer Musseau**
**Petion-Ville, Haiti**
**Hereinafter referred to as the "Subcontractor"**

For

**Haiti Recovery Initiative (HRI)**
**USAID Contract No. DOT-I-00-08-00033-00, Task Order No. 03**

Effective Date:                        January 10, 2011

Total Fixed Price:                    HTG 55,627,320 HTG

Subcontract Documents:  This Subcontract consists of the following documents:



The contents herein of Subcontract No. CHE145-TEMPO Construction-01:

**SECTION A: BACKGROUND, OBJECTIVE, AND SCOPE OF WORK**
A.1 BACKGROUND ............................................................................... 5
A.2  OBJECTIVE ................................................................................... 5
A.3 SCOPE OF WORK............................................................................ 6
A.4 NOTICE TO PROCEED ................................................................... 7

**SECTION B: TERMS AND CONDITIONS**
B.1 SUBCONTRACTOR FUNDING ...................................................... 10
B.2 SUBCONTRACTOR TYPE ............................................................. 10
B.3  PERIOD OF PERFORMANCE........................................................ 10
B.4 DELIVERABLES AND DELIVERABLES SCHEDULE ..................... 10
B.5 PROGRESS REPORTS .................................................................... 13
B.6 RELATIONSHIP BETWEEN THE PARTIES ................................... 13
B.7 AUTHORIZED REPRESENTATIVES............................................... 13
B.8 REPORTING AND TECHNICAL DIRECTION................................. 13
B.9 COMPLIANCE WITH APPLICABLE LAWS AND STANDARDS ...... 15
B.10 GOVERNING LANGUAGE ........................................................... 15

EXHIBIT A

B.11 PRICE SCHEDULE.................................................................... 15
B.12 PERFORMANCE GUARANTEE .............................................. 15
B.13 RESERVED
B.14 PAYMENT SCHEDULE.......................................................... 16
B.15 PAYMENT TERMS ................................................................ 16
B.16 INVOICE REQUIREMENTS.................................................. 17
B.17 TAXES AND DUTIES ............................................................ 19
B.18 REPORTING OF FOREIGN TAXES .................................... 19
B.19 INSURANCE COVERAGE ..................................................... 20
B.20 SET-OFF CLAUSE.................................................................. 20
B.21 INDEMNITY ........................................................................... 20

SECTION C. GENERAL TERMS AND CONDITIONS
C.1 AUTHORIZED GEOGRAPHIC CODE.................................... 22
C.2 INSPECTION AND ACCEPTANCE........................................ 22
C.3. BRANDING POLICY ............................................................... 22
C.4 INTELLECTUAL PROPERTY RIGHTS ................................. 22
C.5 MODIFICATIONS ..................................................................... 22
C.6 CHANGES ................................................................................. 23
C.7 GOVERNING LAW AND RESOLUTION OF DISPUTES...... 23
C.8 FORCE MAJEURE..................................................................... 24
C.9 TERMINATION ......................................................................... 24
C.10 ORGANIZATIONAL CONFLICTS OF INTEREST............... 25
C.11 ENGAGING CHILD LABOR ................................................... 25
C.12 ANTI-KICKBACK .................................................................... 25
C.13 TERRORIST FINANCING PROHIBITION ........................... 26
C.14 SECURITY ............................................................................... 26

SECTION D: SPECIAL TERMS AND CONDITIONS
D.1 KEY PERSONNEL..................................................................... 27
D.2 WORKMANSHIP AND QUALITY CONTROL BY SUBCONTRACTOR ....................... 27
D.3 ANTIQUITIES............................................................................ 27
D.4 DIFFERING SITE CONDITIONS ............................................. 28
D.5 SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK........ 28
D.6 MATERIAL AND WORKMANSHIP ........................................ 28
D.7 SUPERINTENDENCE BY THE SUBCONTRACTOR............. 29
D.8 PERMITS AND RESPONSIBILITIES ...................................... 29
D.9 PROTECTION OF EXISTING VEGETATION, STRUCTURES, EQUIPMENT,
     UTILITIES AND IMPROVEMENTS ........................................ 29
D.10 OPERATIONS AND STORAGE AREAS................................. 29
D.11. USE AND POSSESSION PRIOR TO COMPLETION ............ 30
D.12 CLEANING UP ......................................................................... 30
D.13 ACCIDENT PREVENTION ..................................................... 30
D.14 AVAILABILITY AND USE OF UTILITY SERVICES ........... 30
D.15 SCHEDULES FOR CONSTRUCTION SUBCONTRACTS...... 31
D.16 QUANTITY SURVEYS ............................................................ 31
D.17 LAYOUT OF WORK................................................................ 31
D.18 SPECIFICATIONS AND DRAWING FOR CONSTRUCTION ..................... 31



D.19 REMEDIAL WORK.................................................................................. 32
D.20 SUBSTANTIAL COMPLETION............................................................... 32
D.21 CORRECTION OF DEFECTS.................................................................. 32
D.22 FINAL COMPLETION AND ACCEPTANCE ............................................ 33

**SECTION E. CLAUSES INCORPORATED BY REFERENCE**
E.1 CLAUSES INCORPORATED BY REFERENCE ............................................ 34

**ATTACHMENT A:** EXAMPLE OF BANK GUARANTEE FOR PERFORMANCE SECURITY

In the event of a conflict among the subcontractor's proposal and this subcontract, the contents of this Subcontract shall take precedence over the Subcontractor's proposal.

The Subcontractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein.

The rights and obligations of the parties to this fixed price subcontract shall be subject to and governed by the provisions and specifications attached or incorporated by reference herein and executed by both parties.

For Chemonics International Inc.:

By:   Christopher R. Smith

Title:   Senior Vice President, Contracts

Date:   1/27/11

Place Signed:   Washington, D.C.

For TEMPO Construction.:

By:   Luis A Casanova

Title:  Chief Engineer

Date:   Jan 11th 2011

Place Signed:  Pétion-Ville Haiti.

Contracts Division

JAN 27 2011

CHEMONICS

REVIEWED

ACRONYMS AND DEFINITIONS

The following acronyms and definitions apply to this subcontract:

| | |
|---|---|
| AIDAR | Agency for International Development Acquisition Regulation |
| CFR | Code of Federal Regulations |
| COP | Chemonics HRI Chief of Party |
| CSE | Chemonics Senior Engineer |
| FAR | Federal Acquisition Regulations |
| GOH | Government of Haiti |
| HRI | USAID Haiti Recovery Initiative Project |
| SGSM | Chemonics HRI Senior Grants and Subcontracts Manager |
| Subcontractor | TEMPO Construction |
| US | United States |
| USAID | United States Agency for International Development |
| USG | United States Government |
| VAT | Value Added Tax |
| 935 | USAID Geographic Code 935, as defined in 22 CFR §228.03 |



## SECTION A.    BACKGROUND, OBJECTIVE, AND SCOPE OF WORK

### A.1.    BACKGROUND

Chemonics International Inc. is the prime contractor for USAID's Haiti Recovery Initiative (HRI). HRI is funded by the United States Agency for International Development (USAID), under Contract Number DOT-I-00-08-00033-00, Task Order 03.

The earthquake on January 12, 2010 took a devastating toll on Haiti, destroying and heavily damaging homes, businesses, schools, churches and critical infrastructure. Chemonics, acting on behalf of USAID/OTI, is implementing a series of activities to assist the GoH and the Haitian people in the aftermath of this disaster. Specifically, HRI is focused on three programmatic areas:

*Enabling the Government of Haiti to Function.* In collaboration with international partners, HRI is supporting key local and national government entities in rebuilding operations, strengthening capacity, and increasing their legitimacy through greater responsiveness to the needs of Haitians. HRI is providing temporary office facilities, basic equipment, computers, and communications equipment for the Offices of the President and the Prime Minister and to key ministries. In addition, HRI is providing short-term technical advisors to the Interim Haiti Recovery Commission, the Resettlement Bureau, and other ministries.

*Stabilizing Communities.* HRI seeks to counter the destabilizing effects of mass unemployment, displacement (more than one million Haitians are living in congested camps), the reemergence of gangs, and growing discontent with the pace of the government's response to the disaster. In coordination with the USAID Mission and the international community, HRI is assisting the Government of Haiti (GoH) implement a large-scale cash-for-work program that provides Haitians with temporary employment and reopens public spaces. Projects focus on removing rubble, clearing debris and trash from drainage canals, watershed management activities, and repairing roads and other public infrastructure. The projects target the hardest hit communities in Port-au-Prince and surrounding areas, injecting much-needed cash into communities and engaging youth to work with local and national government and make positive contributions toward the clean-up and recovery efforts in their neighborhoods. 

**Supporting Dialogue on Relief and Recovery.** HRI is supporting activities that foster greater dialogue and information exchange between Haitians, civil society, media, and the GoH. The program is assisting the GoH with its efforts to restore public outreach and intergovernmental communications, providing both infrastructure and short-term technical assistance to the Ministry of Culture and Communications. The program is also providing targeted emergency assistance to Haitian radio stations to increase the quality and quantity of humanitarian assistance news and information broadcast by Haitians, and supporting forums for citizen dialogue and expression and exchanges with the GoH. In addition, HRI programming is establishing and improving the platforms (e.g., press conferences, public meetings) through which citizens, civil society, and government officials discuss Haiti's reconstruction.

The Parliament building housing both the Lower Chamber (Chambre des Deputes) and the Upper Chamber (Senat) partially collapsed during the Jan. 12 earthquake, taking not just the lives of many civil servants, but also burying records and archives and leaving representatives from both Chambers without office space at the time when the country needs efficient and responsive policy-making. Since May, and senators have temporarily relocated to the Police Academy, where their ability to perform legislative

work is limited.

The purpose of this subcontract is to provide material support to the Parliament through the procurement and installation of semi-permanent steel-framed structures to allow for a resumption of parliamentary work. This activity will directly contribute to strengthening the democratic process in Haiti following presidential and parliamentary elections as well as help create the conditions for effective and responsive policy-making during the reconstruction process.

## A.2.   OBJECTIVE

The work required under this subcontract is in direct response to the HRI Program 1: *Enabling the Government of Haiti to Function*. The objective of this project is to furnish and install approximately 2,100 m² of free-standing office assembly and two (2) administrative buildings, to be located in the park, between the main seaport terminal (APN) and the Mausoleum for former President D. Estime, on Blvd La Saline. The proposed facilities would improve working conditions for the elected members of the parliament and other civil servants of the legislative branch of the GoH.

## A.3.   SCOPE OF WORK

The work to be performed under this subcontract shall consist of the following: providing all tools, equipment, materials, supplies, and manufactured articles; furnishing all labor, transportation, and services, including shipping, fuel, power, water, and essential communications; and performing all work or other operations required for the fulfillment of the subcontractThe work shall be complete, and all work, materials, and services not expressly indicated or called for in the Scope of Work which may be necessary for the completion and proper design and construction of the work in good faith shall be provided by the subcontractor. The subcontractor shall be responsible for the final design, procurement, fabrication and installation services associated with the new temporary assembly and administrative facilities for the Parliament of Haiti. The work will be implemented in the following phases:

### Phase 1 – Design Services

The subcontractor shall be responsible for developing Design Documents for all the components associated with the new temporary assembly and administrative facilities for the Parliament of Haiti. In particular, the subcontractor shall develop Design Documents, as per the layouts provided under Attachment D, for each of the proposed buildings and all appurtenances necessary for a complete project. Only minor variations of the proposed buildings, as shown on the attached layouts, will be allowed with respect to overall building footprint and space distribution. The dimensions of each building shall be as shown on the layouts under Attachment D, for an overall usable area of approximately 2,100 square meters.

The proposed assembly and administrative facilities for this project shall be pre-fabricated steel frame units that can be delivered to the work site, and assembled on location. Preference shall be given to proposed units that can be dismantled, and reassembled at an alternate location at the discretion of the GoH. The design documents shall be based on the following criteria, but offerors are encouraged to expand on the criteria in order to produce the best possible design within the constraints of the site:

Design Quality – Achieving design quality in building aesthetics, materials and construction is a major objective for this project. The design shall anticipate a temporary a building with a minimum life expectancy of 10 years.

Design Documents – The design documents shall be comprised of site plan, floor plans, elevations, roofing plans, foundation plan, structural plan, electrical plan, plumbing plan, and HVAC plan for each proposed building. The design documents shall include technical drawings and calculations for the buildings as well as specifications for the proposed materials, fabrication technique, finishes, shipping/storage, and assembly/installation. In addition, the design and specifications for the foundation/ground slab and utility services (water, sanitary, electrical, drainage) shall also be provided. During the development of the design documents, the subcontractor shall take into consideration the proximity of the site to the ocean and thus exposure to winds, saltwater, storm surges, corrosion, etc.

Design Scope – The proposed buildings shall be pre-fabricated steel frame structures to be assembled at the work site. The overall dimensions and space distribution shall be as per the attached layouts. The subcontractor shall be responsible for the technical design and specifications but the following are general guidelines for the proposed buildings:

- Framing: Structural members to be pre-cut cold-formed steel or solid aluminum

- Roof: Covering roof material to be galvanized steel or aluminum panels (min. thickness of 0.4mm). Roof to have a minimum slope of 1:12 to a maximum of 2.5:12.

- Wall: Exterior skin to be galvanized steel panel (min. thickness of 40mm) or fiberglass reinforced plastic (FRP). Interior skin to be FRP or gypsum board. 

- Partitions: Interior partitions to gypsum board or modular walls with laminate.

- Flooring: Finish floor material to be laminated wood or vinyl composition tile (VCT).

- Insulation: Ceiling insulation to have a rating of R-19 or higher. Wall insulation to have a rating of R-5 or higher.

- Windows: Aluminum frame windows to be single hung or casement with average area of 2 square meters.

- Doors: Exterior doors to have a metal skin with average area of 2 square meters.

- All interior electrical, plumbing and mechanical pipes or ducts shall be recessed or enclosed in the floor, walls or ceiling.

Reference Standards – The Design Documents shall be prepared in accordance with the latest requirements of the International Building Code (IBC) as well as other requirements of the Ministère des Travaux Publics Transports et Communications (TPTC), Mairie de Port-au-Prince, and, National Electric Code, ASHRAE, and ACI-318 for similar facilities. In particular, the structures shall be designed to withstand seismic and hurricane conditions prevalent in Haiti, in particular IBC 1613 'Seismic and Wind Design', and ASCE 7-05 'Minimum Design Load for Buildings and Other Structures', or Eurocode 3 'Design of Steel Structures – General Rules'.

## Phase 2 – Procurement and Fabrication

The subcontractor shall be responsible for procuring and/or manufacturing all components of the buildings as well as required ancillaries for a complete installation upon approval of the design documents by Chemonics. The subcontractor shall be responsible for all required payments, storage, shipping and custom clearance, as required. Delays in fabrication, shipping or custom clearance shall be the responsibility of the subcontractor. The subcontractor shall provide a written warranty that all materials used in the fabrication of the building components shall be free from defects for a period of five (5) years from the date of installation.

## Phase 3 – Site Work and Utilities

Subcontractor shall secure and isolate the worksite for the protection of its workforce and the general public. The subcontractor shall prepare the site where the proposed buildings will be located. The subcontractor will be responsible for clearing and grubbing the necessary areas and disposing of the rubbish at an approved facility. Soils and materials testing required to perform and support the design and analysis of the various components shall be included under this phase and shall be the responsibility of the subcontractor.

The subcontractor shall be responsible to establish the baseline of construction and perform all required topographic and boundary surveys. The subcontractor shall also be responsible to locate all existing, if any, underground utilities within the limits of the project area.

The proposed buildings shall rest on reinforced concrete foundation and concrete slab. The size and design of the footings shall be as established in the Design Documents. The finished floor elevation of the proposed buildings shall be a minimum of 18 inches above natural/adjacent grade and shall be accessible via wheelchair. The concrete slab shall have a minimum thickness of 4 inches and reinforced with welded wire mesh or approved equal on a 6 mil vapor barrier. The subcontractor shall backfill and compact the site as necessary to meet the minimum requirements established in the Design Documents. The required anchors shall be pre-set in the concrete footing/slab as per the design specifications.

The subcontractor shall be responsible for all utility connections for the proposed assembly and administrative facilities for the Parliament of Haiti. The utilities shall include all provisions for water service, sanitary waste, electrical service and site drainage. It is anticipated that the subcontractor will be unable to hook up to the city's water supply and sanitary sewer disposal system. Therefore, the subcontractor shall install temporary water and sanitary holding tanks with a minimum holding capacity of one (1) week for the full operating load of the facilities. The water tank(s) can be located above ground. The subcontractor shall include the provision of power poles, transformers, meters, disconnects and wires to hook up to the city's electrical grid. For utility located underground, the subcontractor shall be responsible for all required trenching and repairs necessary for a complete installation. The work shall also include the patching and repair of all existing items disturbed by the subcontractor under this phase. The subcontractor shall be responsible for the disposal of all unsuitable material removed from the work area during construction.

## Phase 4 – Installation

The subcontractor shall be responsible for the assembly and installation of all building components. This includes but is not limited to all base angles, columns, beams, rafters, girders, cross-braces, walls and roofing panels, insulation, doors, windows, interior partitions, flooring,

ceiling, lighting and power equipment, plumbing and sanitary equipment, air-conditioning and ventilation system, and all other appurtenances required for a complete and fully functional facility. The subcontractor shall also be responsible for all cleaning and site maintenance activities during the installation phase and for final cleanup.

All assembly and installation of the structures shall be performed by qualified technicians and a technical representative of the temporary structure's manufacturer. All assembly and installation shall be as per the Design Documents. The work shall also include the patching and repair of all existing items disturbed by the subcontractor under this phase. The subcontractor shall be responsible for the disposal of all unsuitable material removed from the work area during construction.

**Phase 5 – Environmental Compliance**

Due to the nature of this project, the subcontractor shall establish and follow an Environmental Mitigation Plan & Report (EMPR) in order to comply with USAID requirements for the HRI program. The purpose of the EMPR is to evaluate environmental impact of the potential activities and define mitigation actions to be implemented. Using the prescriptions of the EMPR, the subcontractor shall develop and maintain a monitoring and evaluation report during all phases of the project.

## A.4. NOTICE TO PROCEED

The full execution of this subcontract represents the Notice to Proceed. Upon the full execution of this subcontract, the Subcontractor shall commence and complete scheduling activities, permit applications and other preconstruction work to the satisfaction of Chemonics immediately and have completed the same within two calendar days upon receipt of a fully executed copy of the subcontract. Subcontractor shall prepare the Construction Schedule for the Work using the Critical Path Method (CPM). The Subcontractor shall also provide to Chemonics within two calendar days upon receipt of a fully executed copy of the subcontract, proof of insurance coverage in accordance with Section B.19 of this subcontract.



## SECTION B: TERMS AND CONDITIONS

### B.1.   SUBCONTRACT FUNDING

Chemonics International Inc., on behalf of USAID/OTI and in cooperation with the Government of Haiti, is authorized to fund this subcontract under the authority of Chemonics' prime USAID Contract No. DOT-I-00-08-00033-00, Task Order 03, funded by the USG.

### B.2.   SUBCONTRACT TYPE

This is a firm fixed-price subcontract payable entirely in Haitian Gourdes. No additional sums will be payable for any escalation in the cost of materials, equipment or labor, or because of the Subcontractor's failure to properly estimate or accurately predict the cost or difficulty of achieving the results required. Chemonics will not adjust the subcontract price due to fluctuations in currency exchange rates. Chemonics will only make changes in the subcontract price or time to complete due to changes made by Chemonics in the work to be performed, or by delays caused by Chemonics.

### B.3.   PERIOD OF PERFORMANCE

The effective date of this fixed price subcontract is January 10, 2011, and the completion date is June 30, 2011. The Subcontractor shall deliver the deliverables set forth in Section B.4 in accordance with the schedule stipulated therein.

### B.4.   DELIVERABLES AND DELIVERABLES SCHEDULE

B.4.A. Deliverables
The Subcontractor shall deliver to Chemonics the following deliverables, in accordance with the schedule set forth below.

#### PHASE 1: DESIGN SERVICES

**Deliverable 1- Detailed Work Plan:**
The subcontractor shall develop a detailed workplan for review and approval by Chemonics prior to the start of work. At a minimum, the workplan shall include a detailed schedule of implementation for the various phases using the Critical Path Method, the means and methods to be employed for a successful delivery, the identification of required permits, and a listing of the key personnel and their availability as well as the suppliers retained by the subcontractor. In developing the schedule of implementation, the subcontractor shall take into consideration the restrictions associated with the nature and location of the work, transportation and access, storage, availability of utilities to submit a document that is realistic and implementable.

**Deliverable 2-Mobilization**
Upon execution of the subcontract, the subcontractor shall start the mobilization of its workforce, tools and equipment on the worksite. The subcontractor shall be responsible for isolating and securing the worksite for the protection of its workforce and the general public. The subcontractor shall proceed with the installation of temporary facilities for use by its workforce, as necessary.

**Deliverable 3 –Design Documents for Buildings**
The subcontractor shall prepare and submit Design Documents, for each proposed building, for review and approval by Chemonics prior to the start of procurement, fabrication, and installation. Design Documents shall be developed for the proposed buildings based on the terms specified in Phase 1 of the Scope of Work.

The Design Documents shall contain all information necessary for a complete review including but not limited to the basis of calculations, applicable codes and regulations, sizes, dimensions, required materials, quantities, specifications and methods of installation and/or assembly. The subcontractor shall obtain the approval of all Design Documents from the regulatory agencies (Mairie de Port-au-Prince and MTPTC) having jurisdiction over the project as part of this deliverable.

**Deliverable 4 – Design Documents for Site Work (including soil testing)**
The subcontractor shall prepare and submit Design Documents, for the site work required for the installation of the buildings, for review and approval by Chemonics prior to the start of construction. The subcontractor shall be responsible for soil testing required for sizing and specifying the foundation of the buildings and other appurtenances. The Design Documents for the proposed site work shall be based on the terms specified in Phase 1 and Phase 3 of the Scope of Work.

The Design Documents shall contain all information necessary for a complete review including but not limited to the basis of calculations, applicable codes and regulations, sizes, dimensions, required materials, quantities, specifications and methods of installation and/or assembly. The subcontractor shall obtain the approval of all Design Documents from the regulatory agencies (Mairie de Port-au-Prince and MTPTC) having jurisdiction over the project as part of this deliverable.

## PHASE 2: PROCUREMENT AND FABRICATION

**Deliverable 5 – On-Site Delivery of Assembly Building**
Upon the approval of the Design Documents for the proposed Assembly Building, the subcontractor shall initiate the procurement and fabrication process. The subcontractor shall be responsible for all required payments, storage, shipping and custom clearance, as required. Delays in fabrication, shipping or custom clearance shall be the responsibility of the subcontractor. The subcontractor shall provide a written warranty that all materials used in the fabrication of the building components shall be free from defects for a period of five (5) years from the date of installation. The subcontractor shall be responsible for the delivery of the complete building components to the worksite.

**Deliverable 6 - On-Site Delivery of Office Building**
Upon the approval of the Design Documents for the proposed Office Building, the subcontractor shall initiate the procurement and fabrication process. The subcontractor shall be responsible for all required payments, storage, shipping and custom clearance, as required. Delays in fabrication, shipping or custom clearance shall be the responsibility of the subcontractor. The subcontractor shall provide a written warranty that all materials used in the fabrication of the building components shall be free from defects for a period of five (5) years from the date of installation.

Case 1:16-cv-01030-EGS   Document 1-1   Filed 02/08/16   Page 21 of 48

The subcontractor shall be responsible for the delivery of the complete building components to the worksite.

### Deliverable 7 – On-Site Delivery of Accessory Building

Upon the approval of the Design Documents for the proposed Accessory Building the subcontractor shall initiate the procurement and fabrication process. The subcontractor shall be responsible for all required payments, storage, shipping and custom clearance, as required. Delays in fabrication, shipping or custom clearance shall be the responsibility of the subcontractor. The subcontractor shall provide a written warranty that all materials used in the fabrication of the building components shall be free from defects for a period of five (5) years from the date of installation. The subcontractor shall be responsible for the delivery of the complete building components to the worksite.

### PHASE 3: SITE WORK AND UTILITIES

:

### Deliverable 8 - Site Work for Assembly Building

The subcontractor shall furnish all labor, tools, materials, equipment for the work associated with the site work and utilities for the proposed buildings as specified in Phase 3 of the Scope of Work. Under this deliverable, the subcontractor shall be responsible for all required excavation, backfill, compaction for the base of the buildings and utility lines, sidewalks and driveways (as applicable). This work also includes the foundations and finish slabs of the proposed buildings. The subcontractor shall perform the work as per the approved Design Documents and implementation schedule.

### Deliverable 9 – Site Work for Office Building

The subcontractor shall furnish all labor, tools, materials, equipment for the work associated with the site work and utilities for the proposed buildings as specified in Phase 3 of the Scope of Work. Under this deliverable, the subcontractor shall be responsible for all required excavation, backfill, compaction for the base of the buildings and utility lines, sidewalks and driveways (as applicable). This work also includes the foundations and finish slabs of the proposed buildings. The subcontractor shall perform the work as per the approved Design Documents and implementation schedule.

### Deliverable 10 – Site Work for Accessory Building

The subcontractor shall furnish all labor, tools, materials, equipment for the work associated with the site work and utilities for the proposed buildings as specified in Phase 3 of the Scope of Work. Under this deliverable, the subcontractor shall be responsible for all required excavation, backfill, compaction for the base of the buildings and utility lines, sidewalks and driveways (as applicable). This work also includes the foundations and finish slabs of the proposed buildings. The subcontractor shall perform the work as per the approved Design Documents and implementation schedule.

### PHASE 4: INSTALLATION

The subcontractor shall furnish all labor, tools, materials, equipment for the work associated with the installation, finishes and utility connections for the proposed buildings. All materials, equipment and fabricated components installed in the project shall be new and free of defect. The subcontractor shall perform the work as per the approved design documents and implementation

schedule. The subcontractor shall also be responsible for all cleaning and site maintenance activities during the installation phase and for final cleanup

All assembly and installation shall be performed by qualified technicians and/or under the supervision of a technical representative of the manufacturer. All assembly and installation shall be as per the design documents and manufacturer's instructions. The work shall also include the patching and repair of all existing items disturbed by the subcontractor during the installation process. The subcontractor shall be responsible for the disposal of all unsuitable material removed from the work area during construction.

**Deliverable 11 – Shell Installation for Assembly Building**

The subcontractor shall be responsible for the assembly and installation of the shell for the proposed Assembly Building. The work includes but is not limited to all base angles, columns, beams, rafters, girders, cross-braces, walls and roofing panels, insulation, and all other appurtenances required for a complete and fully functional facility. All work shall be performed as per the approved Design Documents.

**Deliverable 12 – Shell Assembly for Office Building**

The subcontractor shall be responsible for the assembly and installation of the shell for the proposed Office Building. The work includes but is not limited to all base angles, columns, beams, rafters, girders, cross-braces, walls and roofing panels, insulation, and all other appurtenances required for a complete and fully functional facility. All work shall be performed as per the approved Design Documents.

**Deliverable 13 – Shell Assembly for Accessory Building**

The subcontractor shall be responsible for the assembly and installation of the shell for the proposed Accessory Building. The work includes but is not limited to all base angles, columns, beams, rafters, girders, cross-braces, walls and roofing panels, insulation, and all other appurtenances required for a complete and fully functional facility. All work shall be performed as per the approved Design Documents.

**Deliverable 14 – Preliminary Finishes for Assembly Building**

The subcontractor shall be responsible for the assembly and installation of preliminary finishes for the proposed Assembly Building. The work includes but is not limited to all doors, windows, interior partitions, flooring, ceiling, and all other appurtenances required for a complete and fully functional facility. All work shall be performed as per the approved Design Documents.

**Deliverable 15 – Preliminary Finishes for Office Building**

The subcontractor shall be responsible for the assembly and installation of preliminary finishes for the proposed Office Building. The work includes but is not limited to all doors, windows, interior partitions, flooring, ceiling, and all other appurtenances required for a complete and fully functional facility. All work shall be performed as per the approved Design Documents.

**Deliverable 16 – Preliminary Finishes for Accessory Building**

The subcontractor shall be responsible for the assembly and installation of preliminary finishes for the proposed Accessory Building. The work includes but is not limited to all doors, windows, interior partitions, flooring, ceiling, and all other appurtenances required for a complete and fully functional facility. All work shall be performed as per the approved Design Documents.

**Deliverable 17 – Final Finishes for Assembly Building**

The subcontractor shall be responsible for the assembly and installation of final finishes for the proposed Assembly Building. The work includes but is not limited to all hardware (locks, handles, hinges, sills, stops) for doors and windows, fixtures for the power and lighting systems, cabinetry for kitchen and toilets, paint, and all other appurtenances required for a complete and fully functional facility. All work shall be performed as per the approved Design Documents.

**Deliverable 18 – Final Finishes for Office Building**

The subcontractor shall be responsible for the assembly and installation of final finishes for the proposed Office Building. The work includes but is not limited to all hardware (locks, handles, hinges, sills, stops) for doors and windows, fixtures for the power and lighting systems, cabinetry for kitchen and toilets, paint, and all other appurtenances required for a complete and fully functional facility. All work shall be performed as per the approved Design Documents.

**Deliverable 19 – Final Finishes for Accessory Building**

The subcontractor shall be responsible for the assembly and installation of final finishes for the proposed Accessory Building. The work includes but is not limited to all hardware (locks, handles, hinges, sills, stops) for doors and windows, fixtures for the power and lighting systems, cabinetry for kitchen and toilets, paint, and all other appurtenances required for a complete and fully functional facility. All work shall be performed as per the approved Design Documents.

**Deliverable 20 – Utilities for Assembly Building**

The subcontractor shall be responsible for the assembly and installation of utilities and utility connections for the proposed Assembly Building. The work includes but is not limited to all rough and piping for the mechanical (a/c), electrical and plumbing systems, rough and final piping between the proposed building and the utility feed (power, water, sanitary, drainage), tanks, control panels, wiring, relays, connectors, condensers, air handlers, ducts, vents, dampers, filters, thermostats, refrigerant, lubricants, valves, pumps, and all other appurtenances required for a complete and fully functional facility. All work shall be performed as per the approved Design Documents.

**Deliverable 21 – Utilities for Office Building**

The subcontractor shall be responsible for the assembly and installation of utilities and utility connections for the proposed Office Building. The work includes but is not limited to all rough and piping for the mechanical (a/c), electrical and plumbing systems, rough and final piping between the proposed building and the utility feed (power, water, sanitary, drainage), tanks, control panels, wiring, relays, connectors, condensers, air handlers, ducts, vents, dampers, filters, thermostats, refrigerant, lubricants, valves, pumps, and all other appurtenances required for a complete and fully functional facility. All work shall be performed as per the approved Design Documents.

**Deliverable 22 – Utilities for Accessory Building**

The subcontractor shall be responsible for the assembly and installation of utilities and utility connections for the proposed Accessory Building. The work includes but is not limited to all rough and piping for the mechanical (a/c), electrical and plumbing systems, rough and final piping between the proposed building and the utility feed (power, water, sanitary, drainage), tanks, control panels, wiring, relays, connectors, condensers, air handlers, ducts, vents, dampers, filters, thermostats, refrigerant, lubricants, valves, pumps, and all other appurtenances required

for a complete and fully functional facility. All work shall be performed as per the approved Design Documents.

**Deliverable 23 – Record Drawings**

Upon completion and acceptance of the installation process, the subcontractor shall submit to Chemonics the record drawings for the project. During the implementation of the project, the subcontractor shall maintain a set of the Design Documents upon which all field changes shall be noted. At the conclusion of the work, the subcontractor shall develop record drawings to accurately reflect 'as-built' conditions of the work associated with this project. The record drawings shall be prepared using AutoCAD (release 2006 or newer) and submitted on compact disks and paper copies. The record drawings must be delivered to Chemonics and found to be acceptable prior to final issuance of payment.

**PHASE 5: ENVIRONMENTAL COMPLIANCE**

**Deliverable 24 – Environmental Compliance**

The subcontractor shall be responsible for implementing and monitoring of an Environmental Mitigation Plan & Report (EMPR) in order to comply with USAID requirements for the HRI program. The work shall include the monitoring and preparation of the evaluation report during all phases of the project. On a monthly basis or as required by the USAID Mission Environmental Officer, the subcontractor shall submit the evaluation report as per the format prescribed in the EMPR.

**B.4.B. Deliverables Schedule**

The Subcontractor shall submit the deliverables described above in accordance with the following Deliverables Schedule:

| Deliverable # | | Description | Due Date |
|---|---|---|---|
| 1 | Phase 1 | Detailed Work Plan | 1/26/11 |
| 2 | Phase 1 | Mobilization | 2/3/11 |
| 3 | Phase 1 | Design Documents for Buildings | 2/3/11 |
| 4 | Phase 1 | Design Documents for Site Work (incl. Soil Testing) | 2/3/11 |
| 5 | Phase 2 | On-Site Delivery of Assembly Building | 3/30/11 |
| 6 | Phase 2 | On-Site Delivery of Office Building | 3/30/11 |
| 7 | Phase 2 | On-Site Delivery of Accessory Building | 3/30/11 |
| 8 | Phase 3 | Site Work for Assembly Building (excavation, backfill, compaction, footing, slab) | 3/30/11 |
| 9 | Phase 3 | Site Work for Office Building (excavation, backfill, compaction, footing, slab) | 4/13/11 |
| 10 | Phase 3 | Site Work for Accessory Building (excavation, backfill, compaction, footing, slab) | 4/27/11 |
| 11 | Phase 4 | Shell Installation for Assembly Building (framing, wall panels, roof panels, mezzanine slab) | 4/13/11 |
| 12 | Phase 4 | Shell Installation for Office Building (framing, wall panels, roof panels, mezzanine slab) | 4/27/11 |
| 13 | Phase 4 | Shell Installation for Accessory Building (framing, wall panels, roof panels, mezzanine slab) | 5/11/11 |



| 14 | Phase 4 | Preliminary Finishes for Assembly Building<br>(partitions, ceilings, windows, doors, flooring) | 5/11/11 |
|----|---------|------|---------|
| 15 | Phase 4 | Preliminary Finishes for Office Building<br>(partitions, ceilings, windows, doors, flooring) | 5/27/11 |
| 16 | Phase 4 | Preliminary Finishes for Accessory Building<br>(partitions, ceilings, windows, doors, flooring) | 5/27/11 |
| 17 | Phase 4 | Final Finishes for Assembly Building<br>(hardware for doors and windows, electrical and plumbing<br>fixtures, paint, cleanup) | 6/10/11 |
| 18 | Phase 4 | Final Finishes for Office Building<br>(hardware for doors and windows, electrical and plumbing<br>fixtures, paint, cleanup) | 6/10/11 |
| 19 | Phase 4 | Final Finishes for Accessory Building<br>(hardware for doors and windows, electrical and plumbing<br>fixtures, paint, cleanup) | 6/10/11 |
| 20 | Phase 4 | Utilities for Assembly Building<br>(rough and final; mechanical-a/c, electrical, plumbing) | 6/10/11 |
| 21 | Phase 4 | Utilities for Office Building<br>(rough and final; mechanical-a/c, electrical, plumbing) | 6/10/11 |
| 22 | Phase 4 | Utilities for Accessory Building<br>(rough and final; mechanical-a/c, electrical, plumbing) | 6/10/11 |
| 23 | Phase 4 | Record Drawings | 6/25/11 |
| 24 | Phase 5 | Implementation and Compliance with EMPR<br>   a)  Month-1<br>   b)  Month-2<br>   c)  Month-3<br>   d)  Month-4<br>   e)  Month-5 | 2/25/11<br>3/24/11<br>4/26/11<br>5/25/11<br>6/25/11 |

B.5.   PROGRESS REPORTS

In order to track the Subcontractor's progress under this subcontract, the Subcontractor shall be required to submit a bi-weekly progress report summarizing the Subcontractor's progress under each deliverable, observations resulting from weekly inspections (see Section C.2), difficulties or irregularities encountered, resolution of problems, recommendations, and other matters related to this subcontract, including updates to the construction schedule. These bi-weekly reports shall be submitted via email to Stanley Fardin, Chemonics/HRI Senior Engineer (sfardin@chemonics.com) with the corresponding invoice, if applicable.

A final report is required for submission prior to final acceptance. This final report should summarize the overall activity carried out under this subcontract.

B.6.   RELATIONSHIP BETWEEN THE PARTIES

Nothing contained herein shall be understood or implied as establishing a relationship of master and servant or principal and agent between Chemonics and the Subcontractor. The Subcontractor, under this agreement, has complete charge of its personnel and any second tier Subcontractors, if any and allowed, performing under this agreement and shall be fully responsible for the services performed by them or on their behalf.

**B.7.   AUTHORIZED REPRESENTATIVES**

Any action, modification, notice, request, or consent required to be given or made pursuant to this subcontract must be in writing and may only be made by the authorized official specified below or his designee:

  Christopher R. Smith   Senior Vice President, Contracts

**B.8.   REPORTING AND TECHNICAL DIRECTION**

The Subcontractor shall render the services and produce the deliverables stipulated in Section B.4 , under the general supervision of the Chemonics/HRI COP, Rhett Gurian, or his designee. The Subcontractor shall not communicate directly with USAID during the performance of this fixed price subcontract. The HRI COP will be responsible for monitoring the Subcontractor's performance under this fixed price subcontract with the assistance of the following individuals:

  Technical direction during the performance of the subcontract shall be provided by the Chemonics/HRI Senior Engineer (CSE) or his/her designee.  The authorized CSE for this subcontract is Stanley Fardin.  See Section B.8 for further details.

  Contractual guidance shall be provided by the Chemonics/HRI Senior Grants and Subcontracts Manager (SGSM), Aurelie Croze, acroze@chemonics.com. The Subcontractor shall address all contractual-related inquiries and correspondence to the SGSM.



The Subcontractor shall submit all reports, deliverables, and invoices to the attention of both the CSE and the SGSM.

**B.8.1.   TECHNICAL DIRECTION TERMS AND CONDITIONS**

The following terms and conditions apply to any technical direction under this subcontract:

(a)  "Technical direction" is defined to include:
  (1)  Written directions to the Subcontractor which provide details, suggest possible lines of inquiry, or otherwise facilitate completion of work;
  (2)  Provision of written information to the Subcontractor which assist in the interpretation of drawings, specifications, or technical portions of the work statement;
  (3)  Review and, where required, provide written approval of technical reports, drawings, specifications, or technical information to be delivered.  Technical directions must be in writing, and must be within the scope of the work as detailed in Section A.

(b)  The CSE is authorized by the COP to take any or all of the following actions:
  (1)  Assure that the Subcontractor performs the technical requirements of the subcontract in accordance with the subcontract terms, conditions, and specifications.
  (2)  Perform or cause to be performed, inspections necessary in connection with (a) above and require the Subcontractor to correct all deficiencies.
  (3)  Perform acceptance-related activities and verification for Chemonics.
  (4)  Maintain all technical-related communications with the Subcontractor.  Written

communications with the Subcontractor and documents shall be signed as "Chemonics Technical Advisor" with a copy furnished to the HRI SGSM.

    (5) Issue written interpretations of technical requirements of Chemonics drawings, designs, and specifications.

    (6) Monitor the Subcontractor's production or performance progress and notify the Subcontractor in writing of deficiencies observed during surveillance, and direct appropriate action to effect correction. Record and report to the COP and SGSM incidents of faulty or nonconforming work, delays or problems.

(c) The CSE is not empowered to award, agree to, or sign any subcontract (including delivery or purchase orders) or modifications thereto, or in any way to obligate the payment of money by Chemonics. The CSE may not take any action which may impact on the subcontract schedule, funds, scope or rate of utilization of level of effort. All contractual agreements, commitments, or modifications which involve prices, quantities, quality, and schedules shall be made only by the COP, in consultation with the CSD.

(d) The CSE is required to meet as appropriate with the Subcontractor and the SGSM concerning performance of items delivered under this subcontract and any other administration or technical issues. Problem areas should be brought to the immediate attention of the SGSM.

(e) In the absence of the designated CSE, the COP may designate someone to serve as CSE in his place. However, such action to direct an individual to act in the CSE's place shall immediately be communicated to the Subcontractor and the SGSM. 

(f) Contractual problems, of any nature, that may arise during the life of the subcontract must be handled in conformance with the subcontract and specific public laws and regulations. The Subcontractor and the CSE shall bring all contracting problems to the immediate attention of the COP and SGSM. Only the Chemonics Senior Vice President of Contracts is authorized to formally resolve such problems. The Chemonics Senior Vice President of Contracts will be responsible for resolving legal issues, and interpreting subcontract terms and conditions, and is the sole authority authorized to approve changes in any of the requirements under this subcontract. These changes include—but will not be limited to—the following areas: scope of work, price, quantity, technical specifications, delivery schedules, and subcontract terms and conditions. In the event the Subcontractor effects any changes at the direction of any other person other than the Chemonics Senior Vice President of Contracts, the change will be considered to have been made without authority.

(g) Failure by the Subcontractor to report to the COP or the SGSM, any action by Chemonics considered to a change, within ten days as required by FAR 52.243-7 (Notification of Changes), waives the Subcontractor's right to any claims for equitable adjustments.


**B.9.**    **COMPLIANCE WITH APPLICABLE LAWS AND STANDARDS**

The Subcontractor shall perform all work in accordance with all applicable laws, ordinances, codes, regulations, and other authoritative rules of the United States and of Haiti and its political subdivisions and with the standards of relevant licensing boards and professional associations. The Subcontractor shall also comply with the applicable FAR and USAID regulations governing this fixed price subcontract,

which are incorporated by reference into this subcontract, and appear in Section E, Clauses Incorporated by Reference.

**B.10.  GOVERNING LANGUAGE**

The Subcontract is executed in the English language, which shall be the binding and controlling language for all matters relating to the meaning and/or interpretation of this Subcontract.

**B.11.  PRICE SCHEDULE**

The Subcontractor shall complete all work (including furnishing all labor, material, equipment, and services) required under this subcontract for the fixed price of 55,627,320 HTG. This price shall include all licenses, permits, administration costs, labor costs, materials, overhead, profit, and all other costs.

**B.12.  PERFORMANCE GUARANTEE**

Within 7 (seven) calendar days after execution of this subcontract, the Subcontractor shall deliver to Chemonics a performance guarantee in the amount of 10% of the subcontract amount in the form of an official bank guarantee or a check. The bank guarantee or check shall be issued by a reputable bank licensed to do business in Haiti. The format of the bank guarantee shall be as indicated in Attachment A. This Guarantee shall be valid until a date 28 days from the date of issue of the Certificate of Substantial Completion.

**B.13. RESERVED**

**B.14.  PAYMENT SCHEDULE**



     As consideration for the delivery of all of the products and/or services stipulated in Section B.4, Chemonics will pay the Subcontractor a total of 55,627,320 HTG. This figure represents the total price of this subcontract and is fixed for the period of performance outlined in Section B.3, Period of Performance. Chemonics will pay the total price through a series of installment payments. Chemonics will make each payment subject to the table, below, after Subcontractor's completion of the corresponding deliverable indicated in the table:

Deliverable Payment Schedule

| Payment # | Description | Amount to be Paid (HTG) |
|---|---|---|
| 1 | Detailed Work Plan | 1,200,000 |
| 2 | Mobilization | 1,357,400 |
| 3 | Design Documents for Buildings | 633,800 |
| 4 | Design Documents for Site Work (incl. Soil Testing) | 400,000 |
| 5 | On-Site Delivery of Assembly Building | 7,576,000 |
| 6 | On-Site Delivery of Office Building | 6,112,000 |
| 7 | On-Site Delivery of Accessory Building | 3,427,000 |

| 8 | Site Work for Assembly Building<br>(excavation, backfill, compaction, footing, slab) | 4,660,000 |
|---|---|---|
| 9 | Site Work for Office Building<br>(excavation, backfill, compaction, footing, slab) | 3,624,000 |
| 10 | Site Work for Accessory Building<br>(excavation, backfill, compaction, footing, slab) | 2,429,760 |
| 11 | Shell Installation for Assembly Building<br>(framing, wall panels, roof panels, mezzanine slab) | 3,232,000 |
| 12 | Shell Installation for Office Building<br>(framing, wall panels, roof panels, upper floor) | 2,600,000 |
| 13 | Shell Installation for Accessory Building<br>(framing, wall panels, roof panels, upper floor) | 1,804,640 |
| 14 | Preliminary Finishes for Assembly Building<br>(partitions, ceilings, windows, doors, flooring) | 1,010,000 |
| 15 | Preliminary Finishes for Office Building<br>(partitions, ceilings, windows, doors, flooring) | 730,000 |
| 16 | Preliminary Finishes for Accessory Building<br>(partitions, ceilings, windows, doors, flooring) | 420,000 |
| 17 | Final Finishes for Assembly Building<br>(hardware for doors and windows, electrical and plumbing<br>fixtures, paint, cleanup) | 1,992,000 |
| 18 | Final Finishes for Office Building<br>(hardware for doors and windows, electrical and plumbing<br>fixtures, paint, cleanup) | 1,550,000 |
| 19 | Final Finishes for Accessory Building<br>(hardware for doors and windows, electrical and plumbing<br>fixtures, paint, cleanup) | 886,000 |
| 20 | Utilities for Assembly Building<br>(rough and final: mechanical-a/c, electrical, plumbing) | 3,744,000 |
| 21 | Utilities for Office Building<br>(rough and final: mechanical-a/c, electrical, plumbing) | 2,690,000 |
| 22 | Utilities for Accessory Building<br>(rough and final: mechanical-a/c, electrical, plumbing) | 1,608,720 |
| 23 | Record Drawings | 340,000 |
| 24 | Implementation and Compliance with EMPR<br>   a) Month-1<br>   b) Month-2<br>   c) Month-3<br>   d) Month-4<br>   e) Month-5 | 320,000<br>320,000<br>320,000<br>320,000<br>320,000 |
| **TOTAL** | | **55,627,320** |



**B.15.   PAYMENT TERMS**

Chemonics shall pay the Subcontractor the subcontract price as provided in B. 11 above. The Subcontractor may submit invoices for payments only for those deliverables that have been accepted and approved by the CSE. Chemonics will pay the Subcontractor's invoice, less the retention amount, within thirty (30) business days after the following conditions have been fulfilled:

   a)   the work performed and invoiced by Subcontractor has been approved by Chemonics;

b)  the invoice has been submitted with the required progress report, in compliance with B.5 above.
c)  the Subcontractor has delivered a proper invoice, in compliance with B. 15 below.

Payment will be made in Haitian Gourds, paid to the account specified in the Subcontractor's invoice. Payment of unpaid balances will be paid upon completion and final acceptance of all works and deliverables by Chemonics.  Any invoices for services rendered and deliverables submitted—but not accepted by Chemonics—will not be paid until the Subcontractor makes sufficient revisions to the deliverables such that Chemonics may approve the deliverables and thus the invoice.

*Retention*: 10% shall be withheld from each payment as a retention amount. 50% of the retention amount shall be released upon issuance of the "Certificate of Substantial Completion" in accordance with Section D.20 and the remaining 50% shall be released after the issuance of "Certificate of Final Acceptance" by Chemonics as described in Section D. 22.

*Liquidated Damages*: In accordance with FAR Clause 52.211-11 "Liquidated Damages" -- Supplies, Services, or Research and Development " (SEPT 2000), if the Subcontractor fails to complete any deliverable as described in section A.2 within the time specified in the Subcontract, or any extension granted by Chemonics, the Subcontractor shall pay to Chemonics as liquidated damages, the sum of HTG 6,000 for each day of delay. The maximum amount of liquidated damage may not exceed 10% of the subcontract total value.

### B.16.   INVOICE REQUIREMENTS

The Subcontractor shall present an invoice to Chemonics only for services and/or products that have been accepted by Chemonics.  The invoice must be an original invoice, submitted to:
+



    Chemonics International Inc.
    USAID/HRI Office – Haiti Recovery Initiative Program
    #11 Rue Chavannes
    Pétion-Ville, Haïti
    Attention:  Bridget Burke, Senior Operations Manager

To constitute a proper invoice, the Subcontractor's invoice must include the following information and/or attached documentation.  This information will assist Chemonics in making timely payments to the Subcontractor:

1.  Subcontractor legal name, subcontract number, invoice date, and invoice number.
2.  Deliverable(s) number, description of approved deliverable(s), and corresponding fixed price(s).
3.  Bank account information to which payment shall be sent and method of payment.
4.  Copy of Chemonics' acceptance of the deliverable(s) invoiced.
5.  Subcontractor Certification, as described below:

*SUBCONTRACTOR CERTIFICATION*

The undersigned hereby certifies that the invoice has been prepared from the books and records of the Subcontractor in accordance with the terms of Subcontract No. CHE145-TEMPO Construction-01, and to the best of my knowledge and belief, all information contained herein is correct.  The sum claimed under this Subcontract is proper and due.

The work reflected by the costs included in this invoice has been performed (except as herewith reported in writing). The quantities and amounts involved are consistent with the requirements of this subcontract, all Chemonics and/or USAID/Haiti approvals have been obtained, and any appropriate refund to Chemonics will be made promptly upon request in the event of disallowance of any claim or part thereof under the terms of this agreement.

I hereby certify, to the best of my knowledge and belief, that:

(1) The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the subcontract;

(2) Payments to subcontractors and suppliers have been made from previous payments received under the subcontract, and timely payments will be made from the proceeds of the payment covered by this certification, in accordance with subcontract agreements and the requirements of the applicable laws of Haiti, and any applicable laws of the United States Government;

(3) This request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract; and

(4) This certification is not to be construed as final acceptance of a subcontractor's performance.

_____

(Signature of Authorized Representative)

_____        _____

(Title)                                                (Date)

**B.17.   TAXES AND DUTIES**

The services performed under this Subcontract are funded by the United States Government and shall, therefore, be exempt from payment of any taxes, duties, fees, levies, and any other impositions for which Chemonics is exempt, during the period of performance of this subcontract. The Subcontractor shall not pay any host country taxes, duties, levies, etc. from which this USAID program is exempt pursuant to the May 2, 1951 Agreement between the United States of America and Haiti. In the event that any exempt charges are paid by the Subcontractor, they will not be reimbursed to the Subcontractor by Chemonics. The Subcontractor shall immediately notify Chemonics if any such taxes are assessed against the Subcontractor or its Subcontractors at any tier.

The Subcontractor is responsible for payment of all applicable taxes, as prescribed under the applicable laws, associated with wages/salaries/compensation for services rendered by individuals employed by the Subcontractor and who are directed to work as required under this Subcontract.

Subcontractor is liable for payment of all applicable taxes associated with revenues (profit), and other such taxes, fees, or dues for which Subcontractor is normally responsible as a result of operating its business.

**B.18.   REPORTING OF FOREIGN TAXES**

a. The Subcontractor must annually submit a report to Chemonics by April 1 of the next year.

b. Contents of Report. The report must contain:
   (i)  Subcontractor/recipient name.
   (ii) Subcontract name with phone, fax and email.
   (iii) Agreement number(s).
   (iv) Amount of foreign taxes assessed by a foreign government [each foreign government must be listed separately] on commodity purchase transactions valued at $500 or more financed with U.S. foreign assistance funds under this agreement during the prior U.S. fiscal year.
   (v)  Only foreign taxes assessed by the foreign government in the country receiving U.S. assistance is to be reported. Foreign taxes by a third party foreign government are not to be reported. For example, if an assistance program for Lesotho involves the purchase of commodities in South Africa using foreign assistance funds, any taxes imposed by South Africa would not be reported in the report for Lesotho (or South Africa).
   (vi) Any reimbursements received by the Recipient during the period in (iv) regardless of when the foreign tax was assessed and any reimbursements on the taxes reported in (iv) received through March 31.
   (vii) Report is required even if the recipient did not pay any taxes during the report period.
   (viii) Cumulative reports may be provided if the recipient is implementing more than one program in a foreign country.

c. Definitions. For purposes of this clause:
   (i)  "Agreement" includes USAID direct and country contracts, grants, cooperative agreements and interagency agreements.
   (ii) "Commodity" means any material, article, supply, goods, or equipment.
   (iii) "Foreign government" includes any foreign governmental entity.
   (iv) "Foreign taxes" means value-added taxes and custom duties assessed by a foreign government on a commodity. It does not include foreign sales taxes.

d. Sub-agreements. The Subcontractor must include this reporting requirement in all applicable subcontracts, sub-grants and other sub-agreements.

e. For further information see http://www.state.gov/m/rm/c10443.htm.

**B.19.  INSURANCE COVERAGE**

During the course of this subcontract, the Subcontractor shall carry and maintain insurance and show proof of coverage as required and prescribed by law, inclusive of the following:

1. General liability insurance as required by the Government of Haiti, and any other applicable laws and as prescribed;
2. Professional liability insurance as required by the Government of Haiti, and any other applicable laws and as prescribed;
3. Worker's compensation insurance covering each employee to the extent required by the Defense Base Act of the United States.
4. Insurance to cover any damages or destruction of works, for whatever cause;
5. Insurance coverage for equipment and tools used under this Subcontract;

6.   All social insurance as required by applicable laws for all employees.
The subcontractor shall provide to Chemonics proof of insurance within two calendar days upon receipt of a fully executed copy of the subcontract.

**B.20.   SET-OFF CLAUSE**

Chemonics reserves the right of set-off against amounts payable to Subcontractor under this subcontract or any other agreement the amount of any claim or refunds Chemonics may have against the Subcontractor.

**B.21.   INDEMNITY**

(a) Subcontractor agrees to indemnify and save harmless USAID and Chemonics, their officers, directors, agents, and employees from and against any and all claims and liability, loss, expenses, suits, damages, judgments, demands, and costs (including reasonable legal and professional fees and expenses) arising out of:

(1) the acts or omissions of Subcontractor, its employees, officers, directors, agents or its Subcontractors;

(2) injury or death to persons, including officers, directors, employees, agents and Subcontractors of Subcontractor, or loss of or damage to property, or fines and penalties which may result, in whole or in part, by reason of the buying, selling, distribution, or use of any of the goods or services purchased or provided under this Subcontract except to the extent that such damage is due to the negligence of Chemonics;

(3) the infringement or violation of any patent, copyright, trademark, service mark, trade secret, or other proprietary interest of any third party resulting from Chemonics' use, distribution, sale, sublicensing, or possession of the goods (including software and all forms of written materials) or services purchased or provided, as authorized hereunder, or from the use or possession of said goods or services by Chemonics, as authorized hereunder; or false claims submitted by Subcontractor or its Subcontractors under this Subcontract or as a result of a Subcontractor misrepresentation of fact or fraud by Subcontractor.



(b) Subcontractor shall defend and settle at its sole expense all suits or proceedings arising out of the foregoing, provided that Subcontractor has notice or is given prompt written notice of such claim or suit and, further, that Subcontractor shall be given necessary information, reasonable assistance and the authority to defend such claim or suit. Subcontractor shall not settle, compromise or discharge any pending or threatened suit, claim or litigation, arising out of, based upon, or in any way related to the subject matter of this subcontract and to which Chemonics is or may reasonably be expected to be a party, unless and until Subcontractor has obtained a written agreement, approved by Chemonics (which shall not be unreasonably withheld) and executed by each party to such proposed settlement, compromise or discharge, releasing Chemonics from any and all liability.

(c) If any of the goods or services provided by Subcontractor hereunder, including without limitation software and all forms of written materials, become the subject of a claim of infringement or violation of a third party's intellectual property, privacy and/or proprietary rights, Subcontractor shall, at its own expense, use its best efforts--

(1) to procure for Chemonics the right to continue use and, if authorized under this Subcontract, distribution of the infringing goods or services or,

(2) to modify the goods or services to make them non-infringing, or to replace them with equivalent, non-infringing counterparts.  If none of the above mentioned can be successfully implemented, then Subcontractor shall refund to Chemonics all monies paid Subcontractor for the infringing goods and services.



## SECTION C. GENERAL TERMS AND CONDITIONS
### C.1.    AUTHORIZED USAID GEOGRAPHIC CODE

All goods and services supplied under this order must meet USAID Geographic Code 935 (Special Free World) requirements as described in the Code of Federal Regulations: 22 CFR §228.

No commodities, items with components from, or related services may be offered from the following countries: Cuba, Iran, Iraq, Laos, Libya, North Korea, Syria. Related services include transportation through, in coordination with or any related or incidental services pertaining to any/all aspects of this subcontract (including fuel, lodging, meals, board, and communications expenses).

### C.2.    INSPECTION AND ACCEPTANCE

Once a week, Chemonics will regularly inspect the services being performed and the supplies furnished to determine whether work is being performed in a satisfactory manner, and that all supplies are of acceptable quality and standards. Inspection and acceptance will be carried out in accordance with Section D20, Section D21 and Section D22.

Neither Chemonics review, approval or acceptance of, or payment for services required under this Subcontract shall be construed as a waiver of any rights under this Subcontract, and the Subcontractor shall be and will remain liable to Chemonics in accordance with applicable laws for all damages to Chemonics caused by the Subcontractor's negligent performance of any of the services furnished under this subcontract.



### C.3.    BRANDING POLICY

It is USAID policy that USAID-financed commodities and shipping containers, and project construction sites and other project locations be suitably marked with the USAID emblem. Marking of subcontract deliverables shall comply with the USAID Graphics Standard Manual available at www.usaid.gov/branding, or any successor branding policy. The Subcontractor shall request specific guidance on signage requirements from the HRI project's Branding Implementation and Marking Plan.

### C.4.    INTELLECTUAL PROPERTY RIGHTS

The ownership of all copyright and other intellectual property rights in respect of any data compilations, research, spreadsheets, graphs, reports, diagrams, designs, work products, software, or any other documents, developed in connection with this Subcontract will exclusively vest in or remain with Chemonics, which shall have all proprietary rights therein, notwithstanding that the Subcontractor or its employees may be the author of the intellectual property. All documents relating to the intellectual property or otherwise connected with this fixed price subcontract, the services, or duties must be returned or delivered to Chemonics at the time of the expiration or termination of the subcontract. The Subcontractor agrees not to publish or make use of any of the intellectual property, or documents relating thereto, without the prior written approval of Chemonics and proper attribution.

### C.5.    MODIFICATIONS

Modifications to the terms and conditions of this Subcontract, including any modification to the scope of work, may only be made by written agreement between authorized personnel of both Parties, and shall not

be effective until the consent of USAID, if applicable, has been obtained. Each Party shall give due notice and consideration to any proposals for modification made by the other Party.

## C.6.   CHANGES

In accordance with FAR Clause 52.243-4 "Changes" (JUN 2007), Chemonics may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this subcontract in the services to be performed.

No services for which an additional cost or fee will be charged by the Subcontractor shall be furnished without the prior written authorization of Chemonics.

## C.7.   GOVERNING LAW AND RESOLUTION OF DISPUTES

(a)      Governing Law. This Subcontract, including any disputes related thereto, shall be governed by the laws of the District of Columbia.

(b)      Disputes with the Government. Chemonics' Prime Contract with the USG is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613). Any claim arising out of the performance of this Subcontract that relates to any decision of the Government under the Prime contract must be resolved in accordance with the clause at FAR 52.233-1 Disputes, which is incorporated herein by reference.



   (1) Any decision of the Government under the Prime Contract, if binding on Chemonics shall also bind the Subcontractor to the extent that it relates to this subcontract, provided that Chemonics shall have promptly notified the Subcontractor of such decision and, if requested by Subcontractor, shall have brought suit or filed claim, as appropriate against the Government, or, in alternative, agreed to sponsor Subcontractor's suit or claim. A final judgment in any such suit or final disposition of such claim shall be conclusive upon Chemonics and the Subcontractor.

   (2) For any action brought, or sponsored, by Chemonics on behalf of the Subcontractor pursuant to this clause, the Subcontractor agrees to indemnify and hold Chemonics harmless from all costs and expenses incurred by Chemonics in prosecuting or sponsoring any such appeal.

(c)      Disputes between the Parties. The following procedures shall govern the resolution of any controversy, dispute or claim between or among "Parties," arising out of the interpretation, performance, breach or alleged breach of this  Subcontract ("Dispute") that is covered by (b) above.

   (1) *Negotiation.* The Parties shall promptly attempt to resolve any Dispute by negotiation in the normal course of business. If, after good faith efforts, the Dispute is not resolved, either Party may request in writing that the Dispute be resolved via Executive Consultation pursuant to subparagraph (c)(2) below.

   (2) *Executive Consultation.* For Disputes submitted to Executive consultation, each party shall designate a senior company official with authority and responsibility for attempting to resolve the matter. For Chemonics, such designee shall be a Senior Vice President, or a person at a higher level of authority. For Subcontractor, such designee shall be a Project Director or a person at a higher level of authority. The Party initiating the claim shall provide, in addition to documents

supporting the claim, a brief summary of the claim, its perception of the positions of the Parties and any perceived barriers to settlement of the case. The summary may be submitted directly to the designated Party Executive. Within 30 calendar days after delivery of the claim summary, the Parties shall meet and attempt to resolve the Dispute. If the Dispute is not resolved within 45 days from submission of the claim summary, or such other amount of time as agreed between the parties, the claiming Party may proceed under subparagraph (c)(3) below.

(3) *Arbitration.* Any controversy or claim between the Parties arising out of or relating to this Subcontract, or the breach thereof, that has not been resolved by Executive Consultation, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, including the Optional Rules for Emergency Measures of Protection, unless otherwise provided herein. The arbitrators shall not be empowered to award damages in excess of compensatory damages and each Party expressly waives and foregoes any right to punitive, exemplary or similar damages. Each Party will bear the cost of its own Attorney-Fees. The Arbitration shall be in Washington, D.C., unless otherwise agreed between the Parties.

(d)     Obligation to perform work. Subcontractor shall diligently proceed with the performance of work pending final resolution of any Dispute.

## C.8.   FORCE MAJEURE

For the purposes of this subcontract, "Force Majeure" means an event or events either of nature or caused by man, which is beyond the reasonable control of a Party—that is, either Chemonics or the Subcontractor—and which makes a Party's performance of its obligations under the subcontract impossible. In no event can a Force Majeure event be caused by the negligence or intentional action of a Party or such Party's Subcontractors or agents or employees. Any Force Majeure event must be an event that a diligent Party could not have reasonably expected and could not have taken action to mitigate or avoid such circumstances which prevent the Party from carrying out its obligations hereunder. Force Majeure causes may include—but are not restricted to—fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, but in every case the failure to perform must be beyond the control and without the fault or negligence of the Subcontractor.



The failure of a Party to fulfill any of its obligations hereunder shall not be considered to be a breach of, or default under, this subcontract insofar as such inability arises from an event of Force Majeure, provided that the Party affected by such an event (a) has taken all reasonable precautions, due care and reasonable alternative measures in order to carry out the terms and conditions of this Subcontract, and (b) has informed the other Party as soon as possible, but not longer than five (5) days about such occurrence.

Any time extensions resulting from a Force Majeure in which a Party could not complete an action or task shall be for the period of time equal to the time the Party was unable to perform due to the Force Majeure event.

## C.9.   TERMINATION

Chemonics reserves the unilateral right to terminate this fixed price subcontract at any time, paying for all deliverables completed at the time of termination and a pro-rata share of any deliverable in progress, in accordance with FAR Clause 52.249-1, Termination for Convenience of the Government (Fixed Price)

(Short Form) (April 1984), which is incorporated by reference in Section C.9 herein.

In the event of a termination for convenience of this subcontract in whole or in part, the COP will deliver to the Subcontractor a Notice of Termination specifying the nature, extent, and effective date of the termination. Upon receipt of the notice, the Subcontractor shall (1) immediately discontinue all services under the subcontract (unless the notice directs otherwise), and (2) deliver to the CSE all data, drawings, specifications, reports, estimates, summaries, and other information and materials accumulated in performing this Subcontract, whether completed or in process. Chemonics shall pay for all deliverables completed at the time of termination, and a pro-rata share of any deliverable in progress, without further financial obligation to the Subcontractor.

In the event that the Subcontractor fails to make progress so as to endanger performance of this fixed price subcontract, or is unable to fulfill the terms of this fixed price subcontract by the completion date, the Subcontractor shall notify Chemonics forthwith and Chemonics shall have the right to summary termination of this fixed price subcontract upon written notice to the Subcontractor in accordance with the incorporated FAR Clause 52.249-8, Default (Fixed-Price Supply and Service).

C.10.   ORGANIZATIONAL CONFLICTS OF INTEREST

It is understood and agreed that some of the work performed under this subcontract may place the Subcontractor or its personnel in the position of having an organizational conflict of interest. Such an organizational conflict of interest may impair the objectivity of the Subcontractor or its personnel in performing the work. To preclude or mitigate any potential conflicts of interest, Subcontractor agrees not to undertake any activity which may result in an organizational conflict of interest without first notifying Chemonics of such potential conflict of interest and receiving Chemonics written approval to undertake such activities.

C.11.   ENGAGING CHILD LABOR

Chemonics neither engages in nor condones unlawful employment, or exploitation of children in the workplace. Consistent with Haitian labor law, the minimum age for full-time employment under this subcontract is 18 years of age.

The Subcontractor shall remunerate employees and consultants employed under this fixed price subcontract in accordance with the pay scales and pay rates established by labor law and/or consistent with reasonable local standards for the type of work to be performed.

The Subcontractor shall inform Chemonics in writing, within 24 hours, if it discovers that:

1. A child under the age of 18 has been employed by the Subcontractor; or
2. An employee or consultant of the Subcontractor knowingly or unknowingly employed an individual under the age of 18; or

C.12.   ANTI-KICKBACK (CORRUPTION)

The following definitions apply to this clause:
- *Kickback*, as used herein, means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind, which is provided, directly or indirectly, to Chemonics, the HRI

office or any of its employees, the Subcontractor or Subcontractor employees, or vendors in any way related to the performance or subsequent activities of this subcontract, for the purpose of improperly obtaining or rewarding favorable treatment in connection with this subcontract.

- *Person*, as used in this clause, means a corporation, partnership, business association of any kind, trust, joint-stock company, or individual.
- *Subcontractor employee*, as used in this clause, means any officer, partner, employee, or agent of the Subcontractor.

The Subcontractor and its employees, whether directly or indirectly engaged in the performance of this subcontract, agree to abide by the terms of The United States Anti-Kickback Act of 1986, which prohibits any person from providing or attempting to provide any kickback; soliciting, accepting, or attempting to accept any kickback; or including, directly or indirectly, the amount of any kickback in the subcontract price charged by the Subcontractor to Chemonics.

When the Subcontractor has reasonable grounds to believe that a violation described in the above paragraph may have occurred, the Subcontractor shall promptly report in writing the possible violation. Such reports shall be made to Chemonics, who shall forward the report to the USAID Inspector General for investigation. The Subcontractor further agrees to cooperate fully with any United States Government agency investigating a possible violation described in the paragraph above.

Chemonics may offset the amount of the kickback against any monies owed by Chemonics under this fixed price subcontract or order the monies withheld from future payments due the Subcontractor.

The Subcontractor agrees to include the substance of this provision in any contract it may issue under this subcontract.



### C.13.   TERRORIST FINANCING PROHIBITION

The Subcontractor is reminded that U.S. Executive Orders and U.S. law prohibits transactions with, and the provision of resources and support to, individuals and organizations associated with terrorism. It is the legal responsibility of the Subcontractor to ensure compliance with these Executive Orders and laws. This provision must be included in all subcontracts issued under this subcontract.

### C.14.   SECURITY

Security in Haiti remains tenuous. Security for the Subcontractor's personnel, equipment, and offices shall be the responsibility of the Subcontractor. The Subcontractor shall assess the security situation in relation to the scope of work of this subcontract and institute appropriate measures to address any security threats. If security factors are expected to disrupt implementation of this subcontract or to cause delay in attaining established targets, it is the Subcontractor's responsibility to immediately notify the Chemonics HRI COP.

## SECTION D.   SPECIAL TERMS AND CONDITIONS

### D.1.   KEY PERSONNEL

The following Subcontractor personnel are designated as key personnel and essential to the work being performed there under.  Prior to diverting any of these individual(s) to other duties, the Subcontractor shall notify Chemonics reasonably in advance and shall submit a justification and explanation (including proposed substitutions) in sufficient detail to permit evaluation of the impact (including financial impact) on the subcontract.  No diversion or replacement of such personnel shall be made by the Subcontractor without the prior written approval of Chemonics. The listing of key personnel may, with the consent of the contracting parties, be amended from time to time during the course of this subcontract to add, change, or delete personnel and positions, as appropriate.  The following positions are considered key personnel under this subcontract:

| Name | Title |
|------|-------|
| Luis A. Casanova | Vice President/Senior Engineer |

### D.2.   WORKMANSHIP AND QUALITY CONTROL BY SUBCONTRACTOR

All construction work provided by the Subcontractor shall comply with the International Building Codes and Standards for construction pertinent to this work.  The Subcontractor is expected to produce work which conforms in quality and accuracy of detail to these standards.  The Subcontractor, at its own expense, is to institute a Quality Assurance Plan and provide experienced managers, engineers, foremen, surveyors, materials technicians and other technical staff, together with all transport, instruments and equipment, to ensure adequate supervision by Subcontractor and execution of the works at all times.



The Subcontractor shall institute an appropriate inspection system set forth in a Quality Assurance Plan. The plan shall include checklists of duties to be carried out, ensuring these duties are carried out by the supervisory staff and senior employees, and carrying out weekly inspections to determine whether the various services are being performed according to the subcontract.  The Subcontractor shall photograph (dated) construction operations daily. Items to be photographed are to include excavations, placement of reinforcements, concrete placement including vibrations, slump tests, placement of pads and other critical areas. The Subcontractor shall provide copies of the weekly inspection reports and photographs to the CSE.

The Subcontractor shall correct and improve promptly any shortcomings and substandard conditions noted during inspections.  The Subcontractor shall bring any conditions beyond the responsibility of the Subcontractor to the attention of the HRI COP or CSE.

### D.3.   ANTIQUITIES

Subject to the provisions defined in the applicable laws, Subcontractor shall immediately notify Chemonics of such findings of fossils, coins, antiquities, historic structures, and other vestiges of geological or archeological interest discovered on site. Chemonics shall then consult with the appropriate

authorities, and advise the Subcontractor of the proper course of action. The Subcontractor shall take reasonable precautions to prevent its workmen or any other persons from removing or damaging any such article or artifact.

### D.4.   DIFFERING SITE CONDITIONS

In accordance with FAR Clause 52.236-2 "Differing Site Conditions" (APR 1984), the Subcontractor shall promptly give a written notice Chemonics of (1) subsurface or latent physical conditions at the site that differ materially from those indicated in this subcontract, (2) unknown physical conditions at the site that differ materially from those indicated in this subcontract, and (3) unknown physical conditions at the site, of an unusual nature, that differ materially from those ordinarily encountered and generally recognized as inherent in the work character provided for in this subcontract.

No request by the Subcontractor for an equitable adjustment to the subcontract under this clause shall be allowed, unless the Subcontractor has given the required written notice.

No request by the Subcontractor for an equitable adjustment to the subcontract for unexpected site conditions shall be considered by Chemonics if made after final payment under this subcontract.

### D.5.   SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK

In accordance with FAR Clause 52.236-3 "Site Investigation and Conditions Affecting the Work" (APR 1984), the Subcontractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost. The Subcontractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonable ascertained from an inspection of the site. Any failure of the Subcontractor to take the actions described and acknowledged in this paragraph will not relieve the Subcontractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceeding to successfully perform the work without additional expense to Chemonics. Chemonics assumes no responsibility for any conclusions or interpretations made by the Subcontractor based on the information made available by Chemonics.

### D.6.   MATERIAL AND WORKMANSHIP

In accordance with FAR Clause 52.236-5 "Material and Workmanship" (APR 1984), all equipment, material, and sections incorporated into the work covered by this subcontract shall be new and of the most suitable grade for the purpose intended, unless otherwise specifically provided for in this subcontract. References in the specifications to equipment, material, articles, or patented processes by trade name, make, or catalog number, shall be regarded as establishing a standard of quality and shall not be construed as limiting competition. The Subcontractor may, at its option, use any equipment, material, article, or process that, in the judgment of the Chemonics CSE, is equal to that named in the specifications, unless otherwise specifically provided for in this Subcontract.

The Subcontractor shall perform all work under this subcontract in a skillful and workmanlike manner. Chemonics reserves the right to request the removal of any Subcontractor employee who is deemed to be incompetent, careless, or otherwise objectionable.

**D.7.   SUPERINTENDENCE BY THE SUBCONTRACTOR**

In accordance with FAR Clause 52.236-6 "Superintendence by the Contractor" (APR 1984), at all times during the performance of this Subcontract and until the work is completed and accepted, the Subcontractor shall have on the work site a competent Site Supervisor who is approved and accepted by Chemonics. The Site Supervisor will have authority to act on behalf of the Subcontractor.

The extent and character of the work to be done by the Subcontractor shall be subject to the general oversight, supervision, direction, control, and approval of authorized Chemonics personnel.

**D.8.   PERMITS AND RESPONSIBILITIES**

In accordance with FAR Clause 52.236-7 "Permits and Responsibilities" (NOV 1991), the Subcontractor shall, without additional expense to Chemonics, be responsible for obtaining any necessary licenses and permits, and for complying with all laws, codes, and regulations applicable to the performance of this work. The Subcontractor shall also be responsible for all damages to persons or property that occur as a result of the Subcontractor's fault or negligence. The Subcontractor shall also be responsible for all materials delivered and work performed until completion and acceptance of the entire work, except for any completed unit of work which may have been accepted under the subcontract.

**D.9.      PROTECTION OF EXISTING VEGETATION, STRUCTURES, EQUIPMENT, UTILITIES, AND IMPROVEMENTS**

In accordance with FAR Clause 52.236-9 "Protection of Existing Vegetation, Structures, Equipment, Utilities, and Improvements" (APR 1984), the Subcontractor shall preserve and protect all structures, equipment, and vegetation (such as trees, shrubs, and grass) on or adjacent to the work site, which are not to be removed and that do not unreasonably interfere with the work required under this Subcontract. 

The Subcontractor shall protect from damage all existing improvements and utilities (1) at or near the work site, and (2) on adjacent property of a third party, the locations of which are made known to or should be known by the Subcontractor. The Subcontractor shall repair any damage to those facilities, including those that are the property of a third party, resulting from failure to comply with the requirements of this Subcontract or failure to exercise reasonable care in performing the work. If the Subcontractor fails or refuses to repair the damage promptly, Chemonics may have the necessary work performed and charge the cost to the Subcontractor.

**D.10.      OPERATIONS AND STORAGE AREAS**

In accordance with FAR Clause 52.236-10 "Operations and Storage Areas" (APR 1984), temporary buildings (e.g., storage sheds, shops, offices) and utilities may be erected by the Subcontractor only with the approval of the CSE and shall be built with labor and materials furnished by the Subcontractor without expense to Chemonics. The temporary buildings and utilities shall remain the property of the Subcontractor and shall be removed by the Subcontractor at its own expense upon completion of the work.

The Subcontractor shall use only established roadways and bridges, or use temporary roadways. When materials are transported in executing the work, vehicles shall not be loaded beyond the loading capacity recommended by the manufacturer of the vehicle or applicable laws. When it is necessary to cross curbs

or sidewalks, the Subcontractor shall protect the property from damage. The Subcontractor shall repair or pay for the repair of any damaged curbs, sidewalks, bridges, and roads.

### D.11.     USE AND POSSESSION PRIOR TO COMPLETION

In accordance with FAR Clause 52.236-11 "Use and Possession Prior to Completion" (APR 1984), Chemonics shall have the right to take possession of or use any completed or partially completed part of the work. Before taking possession of or using any work, Chemonics shall furnish the Subcontractor a list of items of work remaining to be performed or corrected on those portions of the work that Chemonics intends to take possession of or use. However, failure of Chemonics to list any item of work shall not relieve the Subcontractor of responsibility for complying with the terms of the Subcontract. Possession or use by Chemonics shall not be deemed as acceptance of any work under the Subcontract unless indicated in writing.

While Chemonics has such possession or use, the Subcontractor shall be relieved of the responsibility for the loss or damage to work resulting from Chemonics' possession or use, notwithstanding the terms of Section D.8, "Permits and Responsibilities."

### D.12.     CLEANING UP

In accordance with FAR Clause 52.236-12 "Cleaning Up" (APR 1984), the Subcontractor shall at all times keep the work area, including storage areas, free from accumulated waste materials. Before completing the work, the Subcontractor shall remove from the work and premises any rubbish, tools, scaffolding, equipment, and materials that are not the property of Chemonics. Upon completing the work, the Subcontractor shall leave the work area in a clean, neat, and orderly condition acceptable to the Chemonics CSE.

### D.13.   ACCIDENT PREVENTION

In accordance with FAR Clause 52.236-13 "Accident Prevention" (NOV 1991), the Subcontractor shall provide and maintain work environments and procedures that will (1) safeguard the public, as well as Subcontractor's personnel, property, materials, supplies, and equipment exposed to Subcontractor's operations and activities; (2) avoid interruptions in Chemonics operations, and avoid delays in project completion dates; and, (3) control costs in the performance of this subcontract.



Subcontractor shall provide appropriate safety barricades, signs, and signal lights; and comply with all safety standards, laws, regulations, codes, as are applicable in the performance of work as required under this Subcontract.

### D.14.   AVAILABILITY AND USE OF UTILITY SERVICES

In accordance with FAR Clause 52.236-14 "Availability and Use of Utility Services" (APR 1984), the Subcontractor, at its expense and in a workmanlike manner and to the satisfaction of the CSE, shall install and maintain all necessary temporary connections and distribution lines, and all meters required to measure the amount of each utility used for the purpose of determining charges. Before final acceptance of the work by Chemonics, the Subcontractor shall remove all the temporary connections, distribution lines, meters, and associated paraphernalia.

**D.15.   SCHEDULES FOR CONSTRUCTION SUBCONTRACTS**

In accordance with FAR Clause 52.236-15 "Schedules for Construction Contracts" (APR 1984), the Subcontractor, shall, within five days after the effective date of the Subcontract or another period of time determined by the CSE, prepare and submit for approval to the HRI CSE three (3) copies of a practicable schedule showing the order in which the Subcontractor proposes to perform the work, and the dates on which the Subcontractor contemplates starting and completing the several salient features of the work (including acquiring materials, plant, and equipment). The schedule shall be in the form of a critical path chart of suitable scale to indicate appropriately the percentage of work scheduled for completion by any given date during the period. If Subcontractor fails to submit a schedule within the time prescribed, Chemonics may withhold approval of progress payments until the Subcontractor submits the required schedule.

If, in the opinion of the HRI CSE, the Subcontractor falls behind the approved schedule, the Subcontractor shall take steps necessary to improve its progress, without additional cost to Chemonics. In such circumstances, the Chemonics may require the Subcontractor to increase the number of shifts, overtime operations, days of work, and/or the amount of construction plant, and to submit schedules in chart form as the CSE deems necessary to demonstrate how the project will recoup lost time and get back on schedule to finish within the specified period of performance of the subcontract.

Failure of the Subcontractor to comply with the requirements of the CSE under this clause shall be grounds for a determination by the CSE that the Subcontractor is not executing the work with sufficient diligence to ensure completion within the period of performance specified in the subcontract. Upon making this determination, Chemonics may terminate the Subcontractor's right to proceed with the work, or any separable part of it, in accordance with the default terms of this subcontract.

**D.16.   QUANTITY SURVEYS**



In accordance with FAR Clause 52.236-16 "Quantity Surveys (ALT I)" (APR 1984), quantity surveys shall be conducted, and the data derived from these surveys shall be used in computing the quantities of work performed and the actual construction completed and in place. Chemonics reserves the right to conduct such surveys. However it is required that the Subcontractor conduct the original and final surveys and surveys for any periods for which progress payments are requested.

**D.17.   LAYOUT OF WORK**

In accordance with FAR Clause 52.236-17 "Layout of Work" (APR 1984), the Subcontractor shall lay out its work from Chemonics' established baselines and benchmarks indicated on the drawings, and shall be responsible for all measurements in connection with the layout. The Subcontractor shall furnish, at its own expense, all stakes, templates, platforms, equipment, tools, materials, and labor required to lay out any part of the work. The Subcontractor shall be responsible for executing the work to the lines and grades that may be established or indicated by the CSE. The Subcontractor shall also be responsible for maintaining and preserving all stakes and other marks established by the CSE until authorized to remove them. If such marks are destroyed by the Subcontractor or through its negligence before their removal is authorized by the CSE, the Subcontractor will replace them and deduct the expense of the replacement from any amounts due or to become due to the Subcontractor.

**D.18.   SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION**

In accordance with FAR Clause 52.236-21 "Specifications and Drawings for Construction" (APR 1984), the Subcontractor shall keep a copy of the drawings and specifications on the work site and shall give the CSE, who shall promptly make a determination in writing. Any adjustment by the Subcontractor without such a determination shall be at its own risk and expense. The CSE shall furnish, from time to time, clarifications of detailed drawings and other information as considered necessary.

### D.19. REMEDIAL WORK

The HRI CSE, or his authorized representative, will weekly or more often inspect the services being performed and the supplies furnished to determine whether work is being performed in a satisfactory manner, and that all supplies are of acceptable quality and standards.

When any part of the work or any equipment or material is found upon examination by the CSE not to conform to requirements or is at any stage before final acceptance damaged so that it no longer conforms to requirements, the HRI CSE may order its repair or complete removal and replacement, at Subcontractor's expense.

The cost of all supervision and process control, including testing, so carried out by the Subcontractor, shall be deemed to be included in the rates tendered for the related items of work.

### D.20. SUBSTANTIAL COMPLETION

"Substantial Completion" means the stage in the progress of the work as determined and certified by the HRI COP in writing to the Subcontractor, in which the work (or a portion designated by Chemonics) is sufficiently complete and satisfactory. Substantial completion means that the property may be occupied or used for the purpose for which it is intended, and only minor items such as touch-up, adjustments, and minor replacements or installations remain to be completed or corrected which:
- do not interfere with the intended occupancy or utilization of the work, and
- can be completed or corrected within the time period required for final completion.



The "date of substantial completion" means the date determined by the COP or authorized Chemonics representative as of which substantial completion of the work has been achieved.

Chemonics shall have the right to take possession of and use the work upon substantial completion. Upon notice by the Subcontractor that the work is substantially complete (a "Request for Substantial Completion") and an inspection by the CSE or an authorized Chemonics representative (including any required tests), the COP shall furnish the Subcontractor a "Certificate of Substantial Completion." The certificate shall be accompanied by a "Schedule of Defects" listing items of work remaining to be performed, completed or corrected before final completion and acceptance. Failure of the COP to list any item of work shall not relieve the Subcontractor of responsibility for complying with the terms of the subcontract. Chemonics' possession or use upon substantial completion shall not be deemed an acceptance of any work under the subcontract.

### D.21. CORRECTION OF DEFECTS

A "defect" is any part of the SOW not completed in accordance with the Subcontract. The "defects liability period" is 90 calendar days from the date of completion of the works. The defects liability period

shall be extended for as long as defects remain to be corrected.

The HRI COP shall give notice to the Subcontractor of any defects before the end of the defects liability period. The Subcontractor shall, except for any defects resulting from designs furnished or specified by Chemonics, be responsible for correcting any defect in or damage to any part of the works which may appear or occur during the defects liability period and which arises from, either:

- any defective materials, workmanship or design, or
- any act or omission of the Subcontractor.

The Subcontractor shall correct the defect or damage as soon as practicable and at his own cost. Every time notice of a defect is given, the Subcontractor shall correct the subject defect within the length of time specified in the COP's notice. If the Subcontractor has not corrected a defect within the time specified in the COP's notice, the COP will assess the cost of having the defect corrected, and the Subcontractor will pay this amount.

### D.22.   FINAL COMPLETION AND ACCEPTANCE

"Final completion and acceptance" means the stage in the progress of the work as determined by the COP and confirmed in writing to the Subcontractor, at which all work required under the subcontract has been completed in a satisfactory manner, subject to the discovery of defects after final completion, and except for items specifically excluded in the "Certificate of Final Acceptance."

The "date of final completion and acceptance" means the date determined by the COP when final completion of the work has been achieved, as indicated by written notice to the Subcontractor.

Inspection and acceptance of services, reports, and other required deliverables shall take place at the principle place of performance or at any other location where the services are performed and reports and deliverables are produced of submitted. The CSE named in Section B.8 has been delegated authority to inspect and accept all services, reports, and required deliverables.

The Subcontractor shall give the HRI COP at least five (5) days advance written notice of the date when the work will be fully completed and ready for final inspection and tests. Final inspection and tests will be started not later than the date specified in the notice unless the COP determines that the work is not ready for final inspection and so informs the Subcontractor.

If the COP is satisfied that the work under the subcontract is complete (with the exception of continuing obligations), the COP shall issue to the Subcontractor a "Certificate of Final Acceptance" and make final payment upon:

1. Satisfactory completion of all required tests,
2. A final inspection that all items listed by the COP in the Schedule of Defects have been completed or corrected and that the work is finally complete (subject to the discovery of defects after final completion), and
3. Submittal by the Subcontractor of all documents and other items required upon completion of the work, including a final request for payment (Request for Final Acceptance).

**Section E.    CLAUSES INCORPORATED BY REFERENCE**

**E.1.    CLAUSES INCORPORATED BY REFERENCE**

This fixed price subcontract incorporates the following clauses of the Federal Acquisition Regulation (48 Code of Federal Regulations, Chapter 1) and USAID Acquisition Regulation (48 Code of Federal Regulations, Chapter 7) by reference, with the same force and effect as if they were given in full text. The full text is available at http://www.arnet.gov/far/ and http://www.info.usaid.gov/pubs/ads/aidar9-1.pdf. Modifications which apply to this fixed price subcontract appear after each clause. It is understood and agreed that the Subcontractor may be obligated by and to Chemonics for any specifications or documentation required of Chemonics under these clauses, and that references to the Contractor may also refer to the Subcontractor. The Subcontractor hereby agrees to abide by the terms and conditions imposed by these clauses. With respect to documentation and approvals required under these clauses, all such documentation and approvals shall be submitted to or requested from Chemonics.

References in the text of incorporated clauses to "the Government," "USAID," or "Contracting Officer" may, depending on their context, refer to "Chemonics," and references to "the Contractor" may refer to the "Subcontractor."

**Federal Acquisitions Regulation (FAR) Clauses**

| FAR CLAUSE NUMBER | TITLE AND YEAR |
|---|---|
| 52.202-1 | DEFINITIONS (JUL 2004) |
| 52.203-3 | GRATUITIES (APR 1984) |
| 52.203-6 | RESTRICTION ON SUBCONTRACTOR SALES TO THE GOVERNMENT (SEP 2006) |
| 52.203-7 | ANTI-KICKBACK PROCEDURES (JUL 1995) |
| 52.203-8 | CANCELLATION, RESCISSION, AND RECOVERY OF FUNDS FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997) |
| 52.203-10 | PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997) |
| 52.203-11 | CERTIFICATION AND DISCLOSURE REGARDING PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (MAY 1997) |
| 52.203-12 | LIMITATION OF PAYMENT TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (JUN 2003) |
| 52.209-6 | PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT (SEP 2006) |
| 52.211-18 | VARIATION IN ESTIMATED QUANTITY (APR 1984) |
| 52.215-2 | AUDIT AND RECORDS - NEGOTIATION (JUN 1999) |
| 52.215-14 | INTEGRITY OF UNIT PRICES (OCT 1997) |
| 52.222-19 | CHILD LABOR - COOPERATION WITH AUTHORITIES AND REMEDIES (JUN 2004) |
| 52.222-21 | PROHIBITION OF SEGREGATED FACILITIES (FEB 1999) |
| 52.222-22 | PREVIOUS CONTRACTS AND COMPLIANCE REPORT (FEB 1999) |
| 52.222-26 | EQUAL OPPORTUNITY (APR 2002) |
| 52.223-6 | DRUG FREE WORKPLACE (JAN 2001) |



| | |
|---|---|
| 52.225-13 | RESTRICTIONS ON CERTAIN FOREIGN PURCHASES (MAR 2005) |
| 52.225-14 | INCONSISTENCY BETWEEN ENGLISH VERSION AND TRANSLATION OF CONTRACT (FEB, 2000) |
| 52.227-1 | AUTHORIZATION AND CONSENT (JUL 1995) |
| 52.227-2 | NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT (AUG 1996) |
| 52.227-9 | REFUND OF ROYALTIES (APR 1984) |
| 52.228-3 | WORKERS' COMPENSATION INSURANCE (DEFENSE BASE ACT) (APR 1984) |
| 52.229-6 | TAXES - FOREIGN FIXED PRICE CONTRACTS (JAN 1991) |
| 52.236-3 | SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK (APR 1984) |
| 52.236-5 | MATERIAL AND WORKMANSHIP (APR 1984) |
| 52.236-6 | SUPERINTENDENCE BY THE CONTRACTOR (APR 1984) |
| 52.236-7 | PERMITS AND RESPONSIBILITIES (NOV 1991) |
| 52.236-9 | PROTECTION OF EXISTING VEGETATION, STRUCTURES, EQUIPMENT, UTILITIES, AND IMPROVEMENTS (APR 1984) |
| 52.236-10 | OPERATIONS AND STORAGE AREAS (APR 1984) |
| 52.236-11 | USE AND POSSESSION PRIOR TO COMPLETION (APR 1984) |
| 52.236-12 | CLEANING UP (APR 1984) |
| 52.236-13 | ACCIDENT PREVENTION (NOV 1991) |
| 52.236-14 | AVAILABILITY AND USE OF UTILITY SERVICES (APR 1984) |
| 52.236-15 | SCHEDULES FOR CONSTRUCTION CONTRACTS (APR 1984) |
| 52.236-16 | QUANTITY SURVEYS (ALT I) (APR 1984) |
| 52.236-17 | LAYOUT OF WORK (APR 1984) |
| 52.236-21 | SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION (APR 1984) |
| 52.236-23 | RESPONSIBILITY OF THE ARCHITECT ENGINEER SUBCONTRACTOR |
| 52.242-15 | STOP-WORK ORDER (APR 1984) |
| 52.243-1 (Alt I) | CHANGES – FIXED PRICE (AUG 1987) |
| 52.246-12 | INSPECTION OF CONSTRUCTION (AUG 1996) |
| 52.246-21 | WARRANTY OF CONSTRUCTION (APR 1984) |
| 52.246-25 | LIMITATION OF LIABILITY -- SERVICES (FEB 1997) |
| 52.249-1 | TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (APR 1984) |
| 52.249-10 | DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) |



**Agency for International Development Acquisitions Regulation (AIDAR) Clauses**

| AIDAR CLAUSE NUMBER | TITLE AND YEAR |
|---|---|
| 752.202 Alt.70 and Alt.72 | DEFINITIONS ALT. 70/ALT.72 (JANUARY, 1990) |
| 752.211-70 | LANGUAGE AND MEASUREMENT (JUNE, 1992) |
| 752.225-70 | SOURCE, ORIGIN AND NATIONALITY REQUIREMENTS (FEBRUARY, 2007) |
| 752.228-3 | WORKER'S COMPENSATION INSURANCE (DEFENSE BASE ACT) |
| 752.228-9 | CARGO INSURANCE |
| 752.228-70 | MEDICAL EVACUATION (MEDEVAC) SERVICES |
| 752.7005 | SUBMISSION REQUIREMENTS FOR DEVELOPMENT EXPERIENCE DOCUMENTS (OCTOBER, 1997) |
| 752.7009 | MARKING (JANUARY, 1993) |
| 752.7025 | APPROVALS (APRIL, 1984) |